

Eric H. Jaso
Direct Dial: 973.310.4026
ejaso@spiroharrison.com

September 5, 2017

**VIA ECF**
The Honorable P. Kevin Castel, U.S.D.J.
United States District Court
 for the Southern District of New York
500 Pearl Street
New York, NY  10007

    Re:    <u>**Fiorella v. Citigroup Global Markets, Inc. et al. No. 17 Civ. 5123 (PKC)**</u>

Dear Judge Castel:

    This firm represents Plaintiff John Leopoldo Fiorilla ("Fiorilla" or "Plaintiff") in the above-captioned matter, which is set for an initial conference on September 8, 2017 at 2:00 pm. Plaintiff submits this letter in response to the August 28, 2017 pre-motion letter submitted by Defendants Citigroup Global Markets, Inc., and Edward James Mulcahy, Jr. (collectively "CGMI" or "Defendants").  Plaintiff initially filed this action on July 7, 2017.  (ECF No. 1.)  Thereafter, following correspondence between the parties' counsel in which Defendants raised certain issues with the Complaint, he filed an Amended Complaint as of right on August 8, 2017.  (ECF No. 6.)[1]  Defendants ignored Plaintiff's invitation to waive service of the Amended Complaint, and Plaintiff has not yet served Defendants.

    Plaintiff is not pursuing a "vendetta against Citi," and defense counsel's histrionics surely will not divert this Court's attention from the serious, fundamentally Federal issues that Plaintiff raises in this action – issues that go to the very concept and viability of FINRA arbitration and respect for foreign proceedings that recognize the paramount necessity for parties to respect FINRA's jurisdiction.  In short, Citi, having suffered a significant defeat in an arbitration -- the propriety of which it never challenged until after that defeat -- unilaterally abandoned its agreement to binding arbitration (an agreement it routinely imposes on nearly all of its customers and counterparties) and, relying on multiple misrepresentations, succeeded in convincing a New York Supreme Court Justice that Plaintiff had agreed to settle *before the arbitration commenced*. To be clear, this is not an effort to relitigate issues that have already been decided by the state court, but rather, an attempt to enforce *ab initio* a valid arbitration award.  Plaintiff does not claim (here) that the state court got it wrong; in contrast, he claims that the state court *never* had authority or jurisdiction to vacate the arbitration award based on a purported settlement

---

[1] Although Plaintiff believes that his Amended Complaint addresses certain issues raised by defense counsel in that correspondence, he reserves the right to seek leave to further amend his complaint once he reviews Defendants' Motion to Dismiss, if this Court grants leave.

agreement during FINRA proceedings, and certainly had no jurisdiction to impose the terms of such an agreement. That jurisdiction was granted to FINRA by a valid and indeed uncontested agreement of the parties. Further, the state court *never* had the authority to issue a world-wide antisuit injunction preventing Plaintiff from seeking to enforce the FINRA arbitration award in any jurisdiction, regardless of whether the New York state court's vacatur is binding in that jurisdiction. Thus, the issues are not ones that could have been finally resolved by a state court, as both issues challenge whether the State court had the authority (*i.e.* subject matter jurisdiction in the first instance) to act, much less to grant the relief Defendants sought: essentially, stripping Plaintiff of a valid arbitral award, and imposing in its place a one-sided "settlement" encompassing several material terms that the parties never discussed, much less agreed to in substance.

Plaintiff's claims do not run afoul of the *Rooker-Feldman* doctrine. The New York State court clearly lacked subject matter jurisdiction over whether a settlement had been reached by the parties: this was an issue for the arbitrators *solely* to decide (and which they *had* decided, twice, against Citi). *See generally, e.g., Citigroup Inc. v. Abu Dhabi Investment Authority*, No. 13 Civ. 6073 (PKC) Nov. 25, 2013, Slip Op. at 1 ("[U]nder the broad arbitration clause negotiated by the parties at arm's length, the preclusive effect, if any, of the prior arbitration must be determined by arbitrators and not courts."). Accordingly, Plaintiff claims that the judgment of the New York State court was void *ab initio*, under the parties' arbitration agreement, the Federal Arbitration Act and binding FINRA rules. Further, the judgment of the New York court was based on a material misrepresentation to that court regarding the existence of judicial decision that simply didn't exist. Second, and similarly, Plaintiff does not allege (here) that the New York court wrongly issued a worldwide anti-suit injunction; he claims that the court had no jurisdiction to do so. As to both issues, Justice Ramos' disregard for FINRA and foreign law and proceedings (world-wide) has significant federal legal implications that should be addressed by a Federal court.

## FACTUAL & PROCEDURAL BACKGROUND

### *FINRA Arbitration Proceedings*

Like many if not all individuals who entrust their financial affairs and assets to Citi, Plaintiff Fiorilla entered into an arbitration agreement in the event of any dispute he might have with Citi or its employees regarding their management of his investments. Crucially, *no* party has *ever* – to this day – challenged the validity of that agreement, which compels the parties to submit any and all claims to arbitration *and* compels the parties to accept the arbitrators' decision as binding. Unfortunately, CGMI mismanaged and lost millions of dollars, and Fiorilla initiated a FINRA arbitration as he had agreed to do. In just two years, CGMI turned a substantial portion of Fiorilla's life savings, originally valued at nearly twenty *million* dollars, into a little more than twenty *thousand*. Specifically, CGMI had invested Fiorilla's monies in an unhedged stock position in Royal Bank of Scotland ("RBS"). Approximately 90% of Fiorilla's trust account was comprised of RBS stock. On August 2, 2010, Fiorilla filed a notice of claim pursuant to the arbitration agreement. Fiorilla alleged that CGMI had mismanaged his investment account

through negligence, actions in conflict of interest, omissions of material fact, and breaches of its fiduciary duties.

Meanwhile, Citi sued Fiorilla in New York Supreme Court on a promissory note for over one million dollars that had been secured with the assets in Fiorilla's account. That litigation proceeded roughly in parallel with the FINRA arbitration.

A FINRA Panel was constituted and the first day of hearings was set for Tuesday, May 10, 2012. Shortly before that date, the parties' counsel engaged in preliminary settlement discussions. When Fiorilla's prior counsel rejected CGMI's offer of $775,000, prior counsel proposed a $25,000 increase to $800,000, an offer which CGMI did not unconditionally accept. Instead, on May 8, 2012, CGMI's counsel responded with an email annexing a draft written settlement agreement which included essential terms and conditions that Fiorilla theretofore had not (and ultimately never) agreed to. Most importantly, it was unclear to Fiorilla whether the settlement discussions included a proposal to resolve the pending promissory-note litigation, and/or whether Citi was proposing mutual and global releases which would include that dispute.

On May 9, 2012, Fiorilla wrote to his attorneys that "the matter is not settled and that we do indeed intend to arbitrate." On May 11, 2012, Fiorilla advised FINRA that the subject arbitration was not settled. At no time was there agreement as to all of the material settlement terms, an executed written settlement agreement, or an exchange of mutual releases, which are all necessary elements for FINRA arbitrators to conclude a "settlement" under well-established FINRA rules.

On May 21, 2012, CGMI filed with FINRA a petition for an order of expungement of the matter from Defendant Mulcahy's Central Registration Depository ("CRD") record maintained by FINRA. CGMI did not seek to dismiss the arbitration against CGMI, or enforce a settlement agreement. On June 20, 2012, the Panel issued an order denying CGMI's petition for expungement.

The arbitration proceedings continued. In the midst of the arbitration proceedings, on February 13, 2013, CGMI filed another motion to enforce a settlement agreement between Fiorilla and CGMI based on "newly discovered evidence" which consisted of Fiorilla's prior counsel's averments in a Florida disciplinary proceeding that Fiorilla was willing to settle his claims. Critically, on March 18, 2013, the Panel denied Defendants' motion to enforce. The arbitration thus continued, consisting of four pre-hearing sessions and 23 hearing sessions. The hearings concluded, after approximately eighteen months, on July 17, 2013.

On July 30, 2013, the Panel issued the Award. CGMI was held liable for compensatory damages in the amount of $10,750,000 plus prejudgment interest. Mulcahy was held liable for compensatory damages of $250,000 plus prejudgment interest. The Panel once again denied Mulcahy's motion for expungement.

### *CGMI Moves to Vacate the Arbitral Award in State Court*

CGMI moved in the Supreme Court of New York to vacate the arbitral award. In an oral decision, Justice Ramos granted the petition, and later reduced the oral opinion to a very brief written opinion. Justice Ramos found that the matter had been settled during the early stage of the arbitration and wrested jurisdiction from FINRA on that basis, deciding not just to vacate the FINRA arbitration award, but to impose settlement terms on Plaintiff Fiorilla without remand to FINRA or an evidentiary record, or without regard to Citi's separate lawsuit against Fiorilla. The Appellate Division affirmed in a brief opinion on April 9, 2015. *Matter of Citigroup Global Mkts., Inc. v. Fiorilla*, 127 A.D.3d 491 (1st Dep't. 2015). On May 2, 2015, Fiorilla filed a motion for reargument in the Appellate Division, or in the alternative, for leave to appeal to the Court of Appeals. On July 22, 2015, Fiorilla filed his motion for leave to appeal in the Court of Appeals. The Court of Appeals denied review on October 20, 2015. 26 N.Y.3d 908 (2015).

### *French Tribunal*

Fiorilla, a dual U.S. (Florida) and Italian Citizen, subsequently brought an action to enforce the arbitration award in France. The Courts in France recognize the validity of FINRA's arbitral award, irrespective of whether a State Court has found the arbitration invalid. In March 2016, the Tribunal de Grande Instance de Paris recognized and enforced the award.

### *Subsequent NY State Court Proceedings*

On September 9, 2016, Fiorilla brought an order to show cause against CGMI before Justice Ramos under the same index number as the previous action. On September 18, 2016, CGMI brought its own order to show cause and request for a temporary restraining order and preliminary injunction. Justice Ramos heard argument and granted CGMI a worldwide anti-suit injunction preventing Fiorilla from taking any further action to enforce the arbitral award in any foreign jurisdiction.

### *CGMI's Arguments on Vacatur*

Before Justice Ramos, CGMI advanced two arguments in seeking vacatur. CGMI first claimed that the partiality of two of the arbitrators was compromised based on material omissions from FINRA disclosure forms. Justice Ramos did not reach this argument.

Second, as pertinent here, CGMI argued that FINRA had no authority to conduct an arbitration because Fiorilla and CGMI reached a settlement at the beginning of the arbitration proceedings. CGMI cited evidence that showed that Fiorilla's counsel submitted an $800,000 counteroffer to CGMI, to which CGMI responded by attaching a proposed, written agreement. CGMI contended that Fiorilla's authorization to settle, as evidenced by an email to his then-attorney, Steven Toskes, Esq., combined with Fiorilla's counsel's counteroffer, constituted a settlement agreement, which it asked Justice Ramos to enforce. At oral argument, counsel for CGMI also told the Court (inaccurately) that a Florida "court" had found that the parties had

reached a settlement agreement. On the basis of that purported agreement and judicial decision, Justice Ramos vacated Fiorilla's arbitral award.

That second issue was not, however, properly Justice Ramos's to decide. FINRA arbitrators *alone* have the authority to decide whether the parties reached a binding settlement after the initiation of FINRA proceedings. Specifically, FINRA arbitrators are required to apply FINRA's rules, and under FINRA rules, an arbitrator is only permitted to dismiss an arbitration based on a settlement when the parties provide the arbitrator with a fully executed, written settlement agreement. In this case, the record is clear that the parties never executed a written settlement agreement.

As noted, CGMI *twice* moved the arbitration panel to have the purported settlement enforced. The first time, on May 21, 2012, CGMI moved for expungement of individual Mulcahy. CGMI contended that because the matter had been settled, Mulcahy should have been expunged from FINRA's Central Registration Depository. The panel denied the motion. The second time, on February 21, 2013, CGMI directly filed a motion to enforce the purported settlement. The panel denied that motion as well. CGMI never sought relief from a State Court seeking to deprive FINRA of jurisdiction based on that settlement agreement, until after the FINRA award against CGMI, and then only under the improper guise of a motion to vacate.

Critically, for the Panel to have dismissed the arbitration based on a settlement, the parties would have had to submit a final, executed settlement agreement to the arbitrators pursuant to FINRA Rule 12504(a)(6)(A). Indeed, FINRA informed the parties in response to a letter from CGMI's attorneys that the Panel "[i]n cases involving settlements [must] review settlement documents and consider the amounts of payments made to any party and any other terms and conditions of a settlement . . .." The Panel's decisions were both correct under FINRA rules and binding on the parties. The New York State Court did not have jurisdiction or authority to remove that decision and jurisdiction from FINRA.

### *The Basis of Justice Ramos' Decision*

Justice Ramos' comments at oral argument show that he was either deliberately misled or that he overstepped his subject matter jurisdiction. From the very outset, he completely ignored the longstanding principle (including under New York law) that courts owed great deference to an arbitral award where the parties have contractually agreed to binding arbitration. "I don't really care about FINRA . . .. I don't really care about the arbitrator." Tr. at 10:22-23; 10:25-26. Showing his blatant disregard of the FINRA rules or the FINRA panel's authority to making findings as to whether a settlement has been reached under those rules, he stated: "Once you've settled the case, you've agreed not to arbitrate, you've agreed to settle . . .. Why do we have to go any further than that . . .? Why are we still here?" *Id.* at 11:4-6; 11:9-10; 11:14. Justice Ramos further stated:

> Here's what I am facing. I'm facing a situation where I have an agreement to settle, an offer being made by apparently Citigroup. An acceptance by counsel for the claimant in the arbitration.

> That's all for acceptance. That's a deal. I enforce settlements. That's one of the things we do here . . .. FINRA conducts the arbitration anyway, they are on a frolic of their own.

*Id.* at 12:22-13:4; 13:7-13:9. Justice Ramos concluded that given the correspondence to the FINRA panel, FINRA lost jurisdiction "to do anything." Justice Ramos continued, "Why doesn't [the settlement] remove any further authority, legal authority for FINRA to proceed? I don't care what FINRA's rules are. FINRA is an organization independent of the court. They are not part of what we are. They're a private organization. They are authorized by an agreement between the parties. The parties finally agree to settle the case, that's the end of it." *Id.* at 17:26-18:9.

During argument, importantly, Justice Ramos asked if there was an adjudication "in the Florida Court." Counsel Harper responded (completely misleadingly), "Yes." "And that was?" "That the case had been settled." *Id.* at 21:16-22. Justice Ramos concluded, "[t]he petition is granted in all respects. Thank you very much. The decision is on the record. Take your appeal. Don't waste my time with this." *Id.* at 21:22-25.

Justice Ramos wrote a three-page opinion. He wrote, in part, that:

> In light of the fact that this matter was in fact settled and that all parties so advised the panel and FINRA in writing, (which a Florida tribunal had found as fact in a proceeding these respondents commenced) there is no need to delve into the troubling allegations of misconduct by the arbitrators. This award must be vacated.

On May 12, 2014, Justice Ramos entered a written order vacating the award.

## ARGUMENT

### *Justice Ramos' Exceeded his Authority to Vacate the Arbitration Award*

An arbitration award may only be vacated for the reasons delineated in the FAA, 9 U.S.C. § 10(a)(1-4). As pertinent here, an arbitration award may be vacated "if it results from the arbitrators' manifest disregard of the law or if the arbitrators exceeded their powers." *Abu Dhabi Inv. Auth. v. Citigroup*, 556 F. App'x 66, 67 (2d Cir. 2014) (internal quotation marks and citation omitted). "Awards are vacated for manifest disregard only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[] is apparent." *Id.* (quoting *T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 328, 339 (2d Cir. 2010)). The Supreme Court has described overturning an arbitration award as a "high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 556, 671 (2010). The focus of the inquiry in a challenge to an arbitration award where manifest disregard is alleged is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain

issue, *not whether the arbitrators correctly decided the issue.*" *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) (quotation omitted) (emphasis added).

Ironically given his conclusion that the arbitrators automatically lost authority over the parties' dispute once the parties had "settled" (including, crucially, the authority to decide whether the parties had indeed settled), it was plainly *Justice Ramos* who lacked the authority to decide that the parties had agreed to settle. The arbitration panel *twice* rejected CGMI's same argument that the parties had agreed to settle. Under FINRA Rule 12504, the parties would have had to execute a formal, written settlement agreement and submitted it to the panel to seek dismissal and termination of the arbitration. Justice Ramos thus acted *ultra vires* in vacating the arbitration award on that ground. Moreover, assuming solely for the sake of argument that he had the authority to find manifest disregard in the panel's failure to enforce the settlement agreement, the proper remedy would have been for Justice Ramos to have vacated the award and remanded the matter back to FINRA for a new arbitration and not to rubber stamp Citi's self-serving recitation of the purported settlement terms (without taking evidence or establishing a record).

Justice Ramos had no authority to rule over whether a settlement had been reached in the arbitration and thus his decision was void *ab initio*. In *In re Gruntz*, 202 F.3d 1074 (9th Cir. 2000) Ninth Circuit held that actions taken in violation of the automatic stay in bankruptcy are void *ab initio*. The court held that *Rooker-Feldman* is not implicated by collateral challenges to the automatic stay. The court noted that a federal bankruptcy court "does not conduct an improper appellate review of a state court when it enforces an automatic stay that issues from its own federal statutory authority." The same principles would apply in this case.

Furthermore, this Court would not be conducting improper collateral review given that the FAA vests federal courts with the authority to confirm arbitration awards. In *In re James*, 940 F.2d 46, 52-53 (3d Cir. 1991), the Third Circuit wrote that "federal courts that are classed as 'inferior' under Article III have the power to vacate only state court judgments that are considered void *ab initio*. Sound jurisprudential reasons underlie this concept. Because a void judgment is null and without effect, the vacating of such a judgment is merely a formality and does not intrude upon the notion of mutual respect in federal-state interests." Citing *James*, a district court wisely held:

> [A]n exception to the *Rooker-Feldman* doctrine, pertinent here, is that it does not apply where it is pellucidly clear that there is a total lack or want of subject matter jurisdiction for a state court judgment; such judgments are void ab initio and do not warrant the benefit of the *Rooker-Feldman* doctrine. *See, e.g.*, *In re James*, 940 F.2d 46, 52 (3d Cir. 1991). Although this principle has thus far found judicial expression only in bankruptcy cases, there is no reason in principle it should not apply in other contexts, provided it is one of those rare cases where the want of jurisdiction is glaringly appar[e]nt. In such circumstances, the legal context should not matter because void judgments cannot be the basis for *Rooker-Feldman* deference.

*Ark. Chronicle v. Easley*, 321 F. Supp. 2d 776, 781 (E.D. Va. 2004), *rev'd on other grounds*, 183 F. App'x 300 (4th Cir. 2006).

Justice Ramos clearly and egregiously usurped his power not only in vacating the arbitration award (in which case the parties should have started at square one and gone back to arbitration), but also by making a factual finding and reaching a legal conclusion that a binding settlement had occurred. As the First Circuit put it decades ago, "[o]nly in the rare instance of a clear usurpation of power will a judgment be rendered void." *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir. 1972). Justice Ramos' decision is such a "rare instance."

### *Fraud Exception*

CGMI misrepresented before Justice Ramos that there had been an adjudication in a Florida Court that the case had been settled, when it fact, there had not.

The Second Circuit has held, "we have 'never recognized a blanket fraud exception to *Rooker Feldman*.'" *Kropelnicki v. Siegal*, 290 F.3d 118, 128 (2d Cir. 2002) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 186-87 (2d Cir. 1999). It is nevertheless fair to say, as one district court recently put it, that "the Second Circuit has recognized a possible *Rooker-Feldman* fraud exception," *In re Buckskin Realty, Inc.*, No. 13-40083, 2016 Bankr. LEXIS 3458, at *18 (Bank. E.D.N.Y. Sept. 23, 2016). *Id.* (citing *Vossbrink v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014)) (holding that the assertion of fraud claims is not barred by *Rooker-Feldman* because complaint sought damages from the alleged fraud which "does not require the federal court to sit in review of the state court judgment.").

### *Justice Ramos exceeded his authority in issuing the world-wide antisuit injunction*

It was entirely appropriate for Fiorilla to seek to enforce the FINRA arbitral award in France as permitted by French law. Justice Ramos did not have the authority to enjoin Fiorilla from taking action consistent with his FINRA arbitration in every foreign jurisdiction regardless of that foreign jurisdiction's law.

"The doctrine of comity contains a rule of 'local restraint' which guides courts reasonably to restrict extraterritorial application of sovereign power." *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 371 (5th Cir. 2003). The question is whether Justice Ramos had the authority to issue "an injunction, which effectively attempts to arrest the judicial proceedings of another foreign sovereign" and whether the injunction "sufficiently upsets our interest in preserving comity among nations." *Id.* Anti-suit injunctions are used sparingly and should be granted "only with care and great restraint." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 22, 26 (2d Cir. 1987) (quoting *Canadian Filters (Harwich) v. Lear-Siegler*, 412 F.2d 577, 578 (1st Cir. 1969)).

*Karaha* is instructive on this point. The U.S. district court issued a final judgment, and it concluded that an anti-suit injunction was appropriate because another Indonesian action upset comity by permitting the re-litigation of issues already decided by the district court. The Fifth Circuit held that the Indonesian action "[d]oes not interfere with the ability of U.S. courts or courts *of any other enforcement jurisdictions* for that matter, to enforce a foreign arbitral award." *Id.* at 372 (emphasis added). In other words, the Fifth Circuit told the district court it was wrong to interfere in other foreign proceedings—that analysis applies perforce here. Here, the French courts were acting appropriately under French law and it was Justice Ramos who interfered with Plaintiff's pursuit of the arbitral award. "Reaching out to enjoin proceedings abroad cuts against the Convention's grant of separate and limited roles of primary-jurisdiction courts to annul awards, and of secondary-jurisdiction courts *to enforce*, or refuse to enforce, awards in their own countries." *Id.* at 373 (emphasis added). "[T]he utility of the Convention in promoting the process of international commercial arbitration awards depends upon the willingness of national courts to let go of matters they would normally would think of as their own." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 639 n.21 (1985).

Comity mandated that Justice Ramos "let go" of the matter where Plaintiff validly brought an enforcement action in France. The anti-suit injunction now does not even permit Mr. Fiorilla to seek enforcement in Italy, where he is a citizen. Just as the New York state court usurped its own subject matter jurisdiction in vacating the award, it also upset international comity by refusing to respect international judgments.

\* \* \*

For the reasons stated herein, the Amended Complaint seeks appropriate relief and will clearly withstand a motion to dismiss and other any efforts to derail the litigation. There is no reason to accelerate the briefing schedule afforded under the federal rules.

Respectfully Submitted,

*s/ Eric H. Jaso*
Eric H. Jaso